Heath A. WILKINS, Petitioner,

v.

Michael BOWERSOX, Respondent.

No. 91–0861–CV–W–5.

United States District Court,
W.D. Missouri,
Western Division.

May 15, 1996.

Connie M. Francis, Sean O'Brien, Public Interest Litigation Clinic, Kansas City, MO, for petitioner.

Cassandra Kaye Dolgin, Missouri Attorney General's Office, Jefferson City, MO, Ronald Jurgeson, Kansas City, MO, for respondent.

## ORDER

SCOTT O. WRIGHT, Senior District Judge.

This is a petition for writ of habeas corpus under 28 U.S.C. § 2254 by Heath A. Wilkins (petitioner), an inmate in custody at Potosi Correctional Center, Potosi, Missouri. The petitioner seeks to vacate his conviction for first degree murder and sentence of death entered by the Circuit Court of Clay County, Missouri after petitioner waived counsel and entered a guilty plea.[1]

### Background

In the summer of 1985, Petitioner, who was then sixteen years old, lived in a public park in Kansas City with three other teenagers, Marjorie Filipiak, Patrick Stevens and Ray Thompson. The four of them planned and carried out the robbery of a liquor store in Avondale, Missouri, on July 27, 1985. According to the plan, Marjorie Filipiak went to the nearby North Kansas City Hospital and called a cab while the three boys went to the liquor store. Ray Thompson stayed outside the store to act as lookout, and Petitioner and Patrick Stevens went inside the store to rob it. During the robbery, Petitioner fatally stabbed the proprietor of the store, Nancy Allen, as Stevens held her.

Acting on an anonymous tip, Kansas City police arrested Petitioner and his associates in the park on August 10, 1985. After questioning by the police, Petitioner confessed to the murder and robbery. Because of his age, a hearing was conducted to determine whether he would be tried as an adult. Fred Duchardt, the Clay County Public Defender,

---

1. The original named respondent in this action was Paul Delo, who was Superintendent of the Potosi Correctional Center when the petition was filed. Since then, Michael Bowersox has re- placed Mr. Delo as Superintendent and thus has been substituted as the named respondent. For purposes of simplicity, the Court will refer to the respondent as "the State."

was appointed to represent Petitioner at the hearing. After denying counsel's request for a mental examination, the juvenile court on August 15, 1985, entered an order allowing Petitioner to be tried as an adult.

Petitioner was charged as an adult with the offenses of unlawful use of a weapon, first degree murder and armed criminal action. At arraignment in the Clay County Circuit Court, counsel entered the alternative pleas of not guilty and not guilty by reason of mental disease or defect on Petitioner's behalf. Pursuant to that plea, the court ordered a mental examination of Wilkins. Steven A. Mandracchia, Ph.D., a psychologist at Western Missouri Mental Health Center, examined Wilkins in November, 1985.

In January, 1986, Mr. Duchardt visited petitioner in the Clay County jail. At that time, petitioner told Mr. Duchardt that he wished to be executed. A second examination was performed in March, 1986 by William A. Logan, M.D., a psychiatrist with the Menninger Foundation.

A competency hearing was held on Wednesday, April 16, 1986. Dr. Mandracchia testified that he did not believe petitioner had a mental disease or defect "as defined by" Missouri statute. He gave no opinion whether petitioner had a mental disease or disorder outside of the statutory definition, except that he "agree[d] with the past treatment records and past psychiatric and psychological diagnoses." Dr. Mandracchia concluded that petitioner was "competent to proceed". Although Dr. Mandracchia was not aware of petitioner's desire to be executed when he conducted his examination, he testified at the hearing that this fact did not alter his conclusion regarding petitioner's competency to proceed.

Dr. Logan testified that petitioner was "psychiatrically ill" with a "plethora of mental difficulties". However, he did not give an opinion on petitioner's competency to proceed because he interpreted Missouri law to require a psychotic disorder. Dr. Logan stated that although petitioner had no cognitive deficits, his emotional disabilities "could interfere with his decision-making process at certain critical points." Mr. Duchardt insisted that there was "considerable question" about petitioner's competency. Over Mr. Duchardt's protests, the court found him competent to proceed.

Mr. Wilkins then informed the court that he wanted to be sentenced to death. He also stated that he wanted to waive counsel because Mr. Duchardt would not help him get the death penalty. Counsel again reiterated his belief that petitioner was not acting competently. The court deferred action on Petitioner's request until a hearing the following week. On April 23, 1986, the court accepted the waiver of counsel.

Petitioner immediately asked to plead guilty to all charges and be executed. After a brief hearing two weeks later, the court accepted petitioner's *pro se* guilty plea on May 9, 1986 and a sentencing hearing was held on June 27, 1986. The State presented evidence of the crime and testimony by Dr. Mandracchia and Dr. Logan. Petitioner objected to any evidence of his mental disorders that could be construed as mitigating and joined in the State's request for the death penalty. The court found that the murder was wantonly vile, horrible or inhuman because it involved depravity of mind, and that the murder was committed in the course of a robbery. Then the court sentenced petitioner to death.

The sentence was reviewed by the Missouri Supreme Court pursuant to Mo.Rev. Stat. § 565.035 (1986). The Office of the Public Defender was appointed to act as amicus curiae for petitioner on the "appeal". At oral argument, Mr. Wilkins appeared personally before the Missouri Supreme Court, repeated his wish to be executed and requested that amicus counsel be discharged. The court ordered Sam Parwatikar, M.D., a psychiatrist with the Missouri Department of Mental Health, to examine petitioner to determine his "competence to waive counsel" on appeal. Dr. Parwatikar concluded that Petitioner "was not capable of waiving his constitutional right to counsel."

Amicus counsel then moved to remand the matter to the Circuit Court for an evidentiary hearing on Wilkins' mental competence and waiver in light of Dr. Parwatikar's findings. The State objected, arguing that the

review was limited to the statutory criteria in § 565.035. The Missouri Supreme Court denied the motion for remand and appointed the Public Defender to act as counsel for Petitioner.

The Missouri Supreme Court affirmed Petitioner's conviction and sentence on direct statutory review, *State v. Wilkins,* 736 S.W.2d 409 (Mo. banc 1987), with Justices Blackmar, Donnelly and Welliver dissenting on proportionality grounds. Judge Donnelly also wrote separately that proportionality was the only issue properly before the court. On June 30, 1988, the United States Supreme Court granted certiorari to decide whether the execution of a sixteen-year-old offender per se violates the cruel and unusual punishment clause of the Eighth Amendment, and eventually held that it did not. *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989).

On the same day that the Supreme Court granted certiorari, petitioner filed a motion in the sentencing court pursuant to Mo. R.Crim.P. 24.035 to set aside his convictions and sentences. By that time, petitioner was nineteen years old and did not aspire to be executed. Counsel was appointed to represent Petitioner and a hearing on Wilkins' motion was held May 22–26, 1989. Dorothy Lewis, M.D., Jonathan Pincus, M.D., and William O'Connor, Ph.D., conducted testing and clinical interviews and concluded that Wilkins suffers from schizoaffective disorder, a mental disease which rendered him incompetent to proceed at the time of his plea. Dr. Logan also testified that had he been asked to respond to the question posed in the Missouri Supreme Court's order to Dr. Parwatikar, he would have concurred with Dr. Parwatikar—that Wilkins was not "competent" to proceed as his own attorney.

The State called Mr. Duchardt and Dr. Mandracchia. Mr. Duchardt again stated that he believed that Wilkins was not competent at the time of his plea and sentencing hearing. Dr. Mandracchia testified that he would need to perform an additional examination of Petitioner to respond to the State's question about Wilkins' "competence to waive" counsel. Claiming surprise at Dr. Mandracchia's testimony, the State request-

ed a mental evaluation by Dr. Mandracchia to determine whether petitioner was "competent to waive" his constitutional rights and plead guilty and whether petitioner's waiver of counsel and guilty plea were in fact knowing, intelligent and voluntary. After conducting the court-ordered supplemental examination, Dr. Mandracchia testified that the waiver of counsel, guilty plea and waivers of other constitutional rights were not intelligent and voluntary. Nevertheless, the hearing court denied the motion and the Missouri Supreme Court affirmed. *Wilkins v. State,* 802 S.W.2d 491 (Mo.) cert. denied, *Wilkins v. Missouri,* 502 U.S. 841, 112 S.Ct. 131, 116 L.Ed.2d 98 (1991).

Petitioner then filed the Petition for Writ of Habeas Corpus currently before this Court. The First Amended Petition alleged thirteen grounds of constitutional error. On May 16, 1995, this Court entered an Order conditionally granting the Writ on one of Petitioner's claims on the basis of the state court record, without an evidentiary hearing. The Court also considered and denied one other claim, but did not address the eleven remaining claims. After filing a timely notice of appeal, the State requested the Court of Appeals for the Eighth Circuit to remand the case to this Court for resolution of all remaining claims. The motion was granted on October 3, 1995.

After remand, Petitioner renewed his previous request for an evidentiary hearing. Over the State's objections, this Court heard testimony on January 5 and 30, 1996. Petitioner then voluntarily dismissed several claims. On April 23, 1996, this Court set aside the previous Order of May 16, 1995 pursuant to Fed.R.Civ.P. 60(b)(6). The six claims remaining in the Amended Petition will now be considered. The facts relevant to each will be outlined as necessary. For the reasons set forth below, the petition will be granted.

### Evidentiary Hearing

After the remand from the Court of Appeals, this Court exercised its power to hold an evidentiary hearing on dispositive factual issues in the amended petition. The Court's broad authority to do so is well-established under *Townsend v. Sain,* 372

U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). In *Townsend*, the Supreme Court held that district courts always have the discretion to hold evidentiary hearings on dispositive factual issues in habeas litigation: "In every case, [the district court] has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim." *Id.*, 372 U.S. at 318, 83 S.Ct. at 760.

In reliance on *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), the State asserts that the hearing was not authorized. The standard adopted in *Keeney* to limit *mandatory* hearings in certain situations, however, does not purport in any way to limit a habeas court's prerogative to hear additional evidence if there is a factual dispute on nonfrivolous claims. E.g. *Jamison v. Lockhart*, 975 F.2d 1377, 1381 (8th Cir.1992) ("we do not read *Tamayo–Reyes* as altering our discretionary power to order this hearing"); *Pagan v. Keane*, 984 F.2d 61, 64 (2d Cir.1993); *Burden v. Zant*, 975 F.2d 771, 775 (11th Cir.1992) *rev'd on other grounds* 510 U.S. 132, 114 S.Ct. 654, 126 L.Ed.2d 611 (1994); *Sims v. Livesay*, 970 F.2d 1575 (6th Cir.1992). See *Yohn v. Love*, 76 F.3d 508, 516 (3d Cir.1996).

 The Court also believes that a hearing may have been mandatory. Under *Townsend*, a federal district court must hold an evidentiary hearing in six situations, including some circumstances in which the state courts previously held a hearing and made factfindings. *Townsend*, 372 U.S. at 313, 83 S.Ct. at 757.[2] Although it is not necessary to thoroughly examine the *Townsend* requirements now because there was a discretionary hearing, the Court notes that the first two circumstances in *Townsend* may have compelled it in this case: (1) the merits of many dispositive facts were not resolved in the state court hearing; and (2) the state courts' determinations on some facts are not supported by the record as a whole.

 Again, the State's objection based on *Keeney v. Tamayo–Reyes* is not persuasive. The limitation on mandatory hearings imposed by *Keeney* has no relevance here. *Keeney* overruled *Townsend* only in part. It held that a hearing is not mandatory under *Townsend*'s fifth circumstance ("the material facts were not adequately developed at the state court hearing") unless the petitioner can show cause for failing to develop the material facts in the state court and prejudice resulting therefrom or actual innocence. *Keeney*, 504 U.S. at 7–9, 112 S.Ct. at 1719. Petitioner did not fail to develop the material facts in this case. The determinative evidence was presented to the state courts.[3]

After an exhaustive review of the entire file, this Court found that many disputed factual issues were not settled and some findings by the state courts were perplexing. The state record contains ambiguous or contradictory support for certain findings and conclusions, particularly those related to the

---

**2.** A hearing is mandatory if: (1) the merits of the factual dispute were not resolved in the state court hearing; (2) the state factual determination is not supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing or (6) if for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Townsend*, 372 U.S. at 313–19, 83 S.Ct. at 757–60.

**3.** On April 29, 1996, the State filed a motion to preclude consideration of all evidence presented at the hearing in this Court on the basis the April 24, 1996 amendment to 28 U.S.C. § 2254(e)(2), which provides:

"If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that (A) the claim relies on (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

This Court need not determine whether this provision applies retroactively to the evidentiary hearing this court held in January, 1996. Again, this limitation on evidentiary hearings in a federal habeas court applies where a *petitioner* failed to develop facts in state court, which did not happen in this case.

claims challenging the waiver of counsel and guilty plea. Thus, this Court determined that an evidentiary hearing would be at least prudent and valuable, if not required. Given these concerns, with the prospect of a remand later for a hearing, the Court elected to hear additional evidence. See e.g., *Blalock v. Lockhart*, 898 F.2d 1367 (8th Cir.1990). The facts left unresolved by the state courts and the disputable findings will be set forth as necessary in the section of the Order addressing the individual claims for relief.

### Presumption of Correctness of State Court Findings

An issue distinct from the power to hold an evidentiary hearing is whether this Court is bound by the state courts' findings on dispositive factual questions. Under 28 U.S.C. § 2254(d), a state court's factual finding is entitled to a presumption of correctness unless one of seven factors listed in § 2254(d)(1)–(7) is present or unless the factual finding "is not fairly supported by the record".[4]

 This Court is also aware of the changes in the presumption of correctness standard set out in the amendment to § 2254 which was signed into law on April 24, 1996.[5] However, the new statute does not govern the determination of any factual issues in this case. "[C]ongressional enactments ... will not be construed to have retroactive application unless their language requires this re-sult." *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). At least one district court has already rejected the state's position:

> Although certain provisions of Title I of the Antiterrorism and Effective Death Penalty Act of 1996 contain specific effective dates, neither the Act as a whole nor the amendments to § 2254 contains such a date. *See*, Chapter 154, 28 U.S.C. § 266(c). In contrast to Congress' silence with respect to the effective dates of the amendments to § 2254, Chapter 154, which applies only to capital cases, contains a specific effective date provision. *See*, 28 U.S.C. § 2266(c) (stating that "Chapter 154 of title 28, United States Code (as amended by subsection (a)) shall apply to cases pending on or after the date of enactment of this Act.") The relevant legislation contains no language indicating that Congress intended the amendments to § 2254 to apply to cases such as Petitioner's. The inclusion of language in Chapter 154 to the effect that the provisions in Chapter 154 "apply to cases pending on or after the date of enactment of this Act" indicates that Congress knows how to indicate that new legislation applies to pending cases when it intends to do so. The absence of similar language in the amendments to § 2254 indicates that Congress

---

4. 28 U.S.C. § 2254(d) provides in part:

 In any proceeding ... in a Federal court ... for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction ... evidenced by ... adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit

 (1) that the merits of the factual dispute were not resolved in the State court hearing;

 (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

 (3) that the material facts were not adequately developed at the State court hearing;

 (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

 (5) that the applicant was an indigent and the State court, in deprivation of his constitutional

 right, failed to appoint counsel to represent in the State court proceeding;

 (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

 (7) that the applicant was otherwise denied due process of law in the State court proceeding;

 (8) or unless ... the Federal court on a consideration of the record as a whole concludes that such a factual determination is not fairly supported by the record.

5. That statute, 28 U.S.C. § 2254(e)(1), provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The application [sic] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

only intended for such amendments to apply prospectively.

*Schlup v. Bowersox,* No. 4:92CV443, slip op. at 16–17 (E.D.Mo. May 2, 1996). This Court agrees with this sound analysis regarding the retroactivity of this portion of the new legislation.

Moreover, even if the revised provision § 2254(e)(1) did apply, there are certain relevant legal doctrines preliminary to § 2254(d) or § 2254(e)(1) which are not affected by the new statute. The threshold question is what constitutes a "factual" finding, as opposed to a "mixed" question or a purely legal question. Further, common sense dictates that the first exception to the presumption of correctness under § 2254(d)—that the "merits of the factual dispute were not resolved in the state court hearing"—would continue under the new statute. Here, this Court decides questions of law and decides factual issues not resolved by the state courts even though the evidence had been developed there. The end result thus is the same, regardless of which statute applies.

▊ Where factual determinations were made in the state court here, this Court affords a "high measure of deference." *Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982). "This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record." *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983).

Further, § 2254(d) provides that even if the presumption applies, a habeas petitioner may rebut the presumption by establishing "by convincing evidence that the factual determination by the state court was erroneous". Such convincing evidence includes proof presented "at an evidentiary hearing ... in the federal court." See *Demosthenes v. Baal,* 495 U.S. 731, 735, 110 S.Ct. 2223, 2225, 109 L.Ed.2d 762 (1990); *Lahay v. Armontrout,* 923 F.2d 578 (8th Cir.1991). Under the new § 2254(e)(1), the standard for

rebuttal is essentially the same: by "clear and convincing evidence".

▊ Section 2254(d) applies only to the state courts' findings of historical facts. Legal conclusions are not entitled to deference on federal habeas corpus review. *Wright v. West,* 505 U.S. 277, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); *Sumner,* 455 U.S. at 597, 102 S.Ct. at 1306–07; *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). This Court is also free to conduct an independent review of "so called mixed questions of fact and law which require the application of a legal standard to the historical fact determinations." *Thompson v. Keohane,* —— U.S. ——, ——, 116 S.Ct. 457, 459, 133 L.Ed.2d 383 (1995); *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980); *Jones v. Jones,* 938 F.2d 838, 842 (8th Cir.1991).[6] For each allegation of constitutional error, the court will employ these legal standards in reference to the state courts' findings.

### Analysis

### I. Waiver of Counsel

Petitioner contends that he was denied his constitutional rights under the Sixth and Fourteenth Amendments because the waiver of his right to counsel was not made knowingly, intelligently and voluntarily. The State argues that the record supports the state courts' conclusion that the waiver was knowing, intelligent and voluntary. The State also asserts that the abuse-of-the-writ defense bars this Court's consideration of the claim after the remand from the Court of Appeals.

### A. Abuse of the Writ

▊ The abuse-of-the-writ doctrine generally prohibits a petitioner from raising claims in a subsequent habeas petition that could have been, but were not, raised in the first federal habeas proceeding. *McCleskey v. Zant,* 499 U.S. 467, 490, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991). The general bar against abusive claims also extends to successive claims which raise grounds identical to

---

**6.** As stated above, new § 2254(e)(1) does not change this.

those heard and decided on the merits in a previous petition. *Sawyer v. Whitley*, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).

█ This Court did determine that petitioner had not validly waived his right to counsel and granted the writ of habeas corpus on that basis in an Order dated May 16, 1995. However, under the procedural circumstances in this case, this is not a successive claim and the abuse-of-the-writ defense is not applicable.

In the previous Order, this Court declined to address eleven of the thirteen allegations of constitutional error raised in the amended petition. The Court of Appeals thus remanded the case, before briefing or arguments on appeal, for resolution of the remaining issues. Petitioner raised the waiver of counsel issue again after remand, perhaps fearing that the failure to do so would be taken as a default. He also voluntarily dismissed with prejudice several other claims, paring down to six the number of remaining claims for relief. This Court then set aside the previous order and judgment under Fed.R.Civ.P. 60(b) so that all six issues would be decided in a single order, for the sake of clarity and judicial economy. Order dated April 23, 1996. Under no tenable theory is the claim barred from this Court's review. See *Murray v. Delo*, 34 F.3d 1367, 1374 (8th Cir.1994). This is a first habeas corpus petition to which the doctrine of abuse of the writ does not apply. *Lonchar v. Thomas*, —— U.S. ——, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996).[7]

**B. Merits**

█ The Sixth and Fourteenth Amendments of the United States Constitution guarantee a criminal defendant in a state proceeding the right to counsel. *Gideon v. Wainwright*, 372 U.S. 335, 342–44, 83 S.Ct. 792, 795–97, 9 L.Ed.2d 799 (1963). The accused person does have a corollary right to waive counsel and proceed pro se, but only if the waiver is knowing, intelligent and voluntary. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The constitution "imposes the serious and weighty responsibility upon the trial judge [to determine] whether there is an intelligent and competent waiver by the accused." *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In doing so, the court must "indulge every reasonable presumption against waiver" because the purpose of the right to counsel is "to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights". *Id.*, at 464, 465, 58 S.Ct. at 1023, 1023 (1938) (citing *Aetna Insurance Co. v. Kennedy*, 301 U.S. 389, 393, 57 S.Ct. 809, 811–12, 81 L.Ed. 1177 (1937)).

█ "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson*, 304 U.S. at 464, 58 S.Ct. at 1023. "To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand." *von Moltke v. Gillies*, 332 U.S. 708, 723–24, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948).

█ The trial court must make a meaningful inquiry to determine whether a particular defendant's waiver of these rights is a "voluntary and intelligent choice among the alternative courses of action". *Schone v. Purkett*, 15 F.3d 785, 788–89 (8th Cir.1994). "To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all

---

7. It is unclear from earlier pleadings whether the State asserts a procedural default defense to this claim. The Court notes, however, that the claim is not procedurally barred. The issue was presented to the Missouri Supreme Court in the "Motion to Reverse Judgment and Sentence and to Remand for Appointment of Counsel", filed by appointed amicus counsel after Dr. Parwatikar reported that Petitioner had not intelligently and voluntarily waived his right to counsel. The issue was raised again in the Rule 24.035 appeal, with reference to the relevant federal case law. See *Walton v. Caspari*, 916 F.2d 1352 (8th Cir. 1990).

other facts essential to a broad understanding of the whole matter." *von Moltke,* 332 U.S. at 724, 68 S.Ct. at 323.

 Because *Johnson* commands that the unique characteristics and background of each individual defendant must be examined, the fact that an accused person tells the trial court that "he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility.... A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." *von Moltke,* 332 U.S. at 724, 68 S.Ct. at 323. "[T]he ultimate test for whether there has been a valid waiver of the right to counsel is not the trial court's express advice, but rather the defendant's understanding". *United States v. Cash,* 47 F.3d 1083, 1088 (11th Cir.1995).

 A finding that a criminal defendant is "competent to proceed" does not resolve the issue whether his waiver of counsel is knowing, intelligent and voluntary.[8] These are two separate questions. Both must be answered in the affirmative before there can be an effective waiver of the constitutional right to counsel. *Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). In *Godinez,* the United States Supreme Court explained that "when a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must also be intelligent and voluntary before it can be accepted". *Id.* at 402, 113 S.Ct. at 2688. The *Godinez* Court finally explained the distinction between these two requirements, which has caused much confusion in this and other cases. The "focus of the competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and

whether the decision is uncoerced." *Id.* at 401, n. 12, 113 S.Ct. at 2687, n. 12 (emphasis in original) (citations omitted).

Thus, "a finding that a defendant is competent to stand trial ... is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Id.* at 400, 113 S.Ct. at 2687 citing *Parke v. Raley,* 506 U.S. 20, 28–30, 113 S.Ct. 517, 523, 121 L.Ed.2d 391 (1992) (The test is whether the waiver represents a voluntary and intelligent choice among the alternative courses of action open to the defendant), and *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541 (accused must "knowingly and intelligently" forego benefits of right to counsel).

In this case, as in others throughout the circuits before *Godinez,* the courts and the parties have repeatedly confounded and often interchanged the terms "competency to proceed" with "competency to waive the right to counsel" and "knowing, intelligent and voluntary waiver of counsel". The misunderstanding may stem from *Westbrook v. Arizona,* 384 U.S. 150, 150, 86 S.Ct. 1320, 1320, 16 L.Ed.2d 429 (1966), where the Supreme Court stated that a state trial court's finding that a defendant was "competent to stand trial" did not resolve the separate issue of his "competence to waive his constitutional right to the assistance of counsel" and proceed *pro se.* After *Westbrook,* it was unclear whether there was a different, more stringent test for "competency" required to waive certain rights, such as the right to counsel, than the test for competency to stand trial. The law within this circuit alone was conflicting. Compare *Blackmon v. Armontrout,* 875 F.2d 164, 166 (8th Cir.) *cert. denied,* 493 U.S. 939, 110 S.Ct. 337, 107 L.Ed.2d 326 (1989) and *White Hawk v. Solem,* 693 F.2d 825, 829–30, n. 7 (8th Cir.1982) *cert. denied* 460 U.S. 1054, 103 S.Ct. 1505, 75 L.Ed.2d 934 (1983).

---

**8.** Petitioner has dismissed the claim that he was not competent to proceed, which this Court had denied in the previous order.

In *Godinez,* the Supreme Court finally settled the matter by explaining what it "had in mind in *Westbrook*":

> When we distinguished between "competence to stand trial" and "competence to waive the constitutional right to the assistance of counsel", we were using "competence to waive" as a shorthand for the "intelligent and competent waiver" requirement of *Johnson v. Zerbst.*

*Godinez,* 509 U.S. at 401, 113 S.Ct. at 2688. The Court held that, "[i]n this sense this *is* a 'heightened' standard for pleading guilty and waiving the right to counsel, but it is not a heightened standard of *competence.*" *Id.* at 401, 113 S.Ct. at 2687 (emphasis in original). *Godinez* also reaffirmed the trial court's "serious and weighty responsibility ... to determine whether there is an intelligent and competent waiver by the accused". *Id.* at 401, 113 S.Ct. at 2688.

 The semantic chaos after *Westbrook* has additional relevance in this habeas corpus proceeding because a state court's determination of competency is a factual finding entitled to a presumption of correctness under § 2254(d). *Thompson,* — U.S. at ——, 116 S.Ct. at 459 citing *Maggio v. Fulford,* 462 U.S. 111, 117, 103 S.Ct. 2261, 2264, 76 L.Ed.2d 794 (1983). However, a "waiver of the Sixth Amendment right to assistance of counsel is not a question of historical fact, but rather requires application of constitutional principles to facts." *Thompson,* — U.S. at ——, 116 S.Ct. at 459 citing *Brewer v. Williams,* 430 U.S. 387, 404 and n. 4, 97 S.Ct. 1232, 1242 and n. 4, 51 L.Ed.2d 424 (1977). Although subsidiary factual findings must be presumed correct, the ultimate question requires an assessment of the totality of circumstances. See *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). This is a matter for independent federal determination. *Cuyler,* 446 U.S. at 342, 100 S.Ct. at 1714–15; *Miller,* 474 U.S. at 112, 106 S.Ct. at 450–51 (voluntariness of confession context).

The initial question here then, is whether the trial court or the Missouri Supreme Court made the sort of factual findings, evidenced by a written record, which this Court must accept in making the ultimate decision on the waiver of counsel. *Sumner,* 449 U.S. 539, 101 S.Ct. 764. A state court's resolution of an issue does not always include a finding of historical fact. "There is a fundamental difference between a ruling on a motion, essentially a legal determination, and a finding of fact." *Elem v. Purkett,* 64 F.3d 1195, 1200 (8th Cir.1995) quoting *Jones,* 938 F.2d at 842. If there are such factual findings in the record, then the Court must examine whether one of the exceptions in § 2254(d) negates the presumption of correctness. Finally, this Court will determine the legal conclusion supported by the relevant facts.

 The record in this case shows that the trial court made no factual findings when it consented to Petitioner's waiver of counsel. (Cir.Ct.Tr. at 42–90).[9] Rather, the trial judge expressed the mistaken belief that he was obliged to accept the waiver of counsel because Mr. Wilkins had been found competent to proceed. When notified that petitioner sought to waive counsel, the court stated:

> I suppose as long as this court finds that he is competent and able to conduct himself in a competent manner then he will, I guess, be permitted to pursue that avenue that he chooses.
>
> But, on the other hand, at his age and with his lack of legal training and schooling and considering the seriousness of the offense, this court feels that the availability of legal counsel is essential so that he can rely upon it, at least if he wants to, you see?

(Cir.Ct.Tr. at 45–46). See also Cir.Ct.Tr. at 62.

The trial court had just found that petitioner was competent to proceed when defense counsel Fred Duchardt and Mr. Wilkins announced that he wanted to waive counsel, plead guilty and seek the death penalty. (Cir.Ct.Tr. at 42–45). The court told petitioner many times that he had the right to counsel and the right to waive counsel. Acknowledging that petitioner was sixteen years old with only a ninth grade education and no legal knowledge or experience, the

---

9. The Court will refer to the transcript of the arraignment, competency hearings, pleas of guilty and sentencing before Judge McFarland as the "Circuit Court Transcript" or "Cir.Ct.Tr."

court stated that the circumstances of the case cautioned against the waiver of counsel. (Cir.Ct.Tr. at 43–44).[10] The trial judge urged Mr. Wilkins to accept counsel and instructed him to think about his decision for a few days. The court ordered Mr. Duchardt to remain available to answer any questions petitioner might have. (Cir.Ct.Tr. at 59, 67.)

The next hearing on the motion to waive counsel was held one week later. The court again cautioned petitioner about the dangers of proceeding *pro se,* and informed him about other constitutional rights, reciting a list including the right to confrontation, compulsory process, appeal and so forth. (Cir.Ct.Tr. at 69–79). The court explained that counsel could help protect those rights and expressly told Mr. Wilkins that he faced two possibilities for punishment upon conviction: the death penalty or life in prison without parole. (Cir.Ct.Tr. at 69–79). Petitioner continued to assert that he wanted to waive counsel. (Cir. Ct.Tr. at 70–79). Mr. Duchardt continued to assert that he did not believe Mr. Wilkins was "competent to make those decisions." (Cir.Ct.Tr. at 41, 81). The court then provided petitioner with waiver of counsel forms and accepted the waiver, but again advised petitioner to reconsider. (Cir.Ct.Tr. at 83–88, 94–95).

Although the trial court strongly encouraged petitioner to accept the services of counsel, the circumstances of this case demanded more. The Constitution required the trial court to consider the "background and experience" of Mr. Wilkins, who at the time was a juvenile with a long history of institutionalization for mental disorders and suicide attempts. Here, as in *von Moltke,* the judge did not make a "penetrating and comprehensive" examination of all the circumstances or "investigate as long and thoroughly" as the circumstances of this case demanded to determine if Mr. Wilkins actually made a knowing, intelligent and voluntary waiver. *von Moltke,* 332 U.S. at 723–24, 68 S.Ct. at 323–24.

The omission is significant in this case. Petitioner was a sixteen year-old boy with less than a ninth grade education when he waived his right to counsel, entered the guilty plea and was sentenced to death. He had lived in mental institutions since he was ten. His background before being institutionalized included severe beatings and abuse by his mother and her live-in boyfriends. Child care frequently consisted of being locked alone in a room for hours without toilet facilities. (Cir.Ct.Tr. at 66, 357, 528–534, 358). The mother regularly used illegal drugs. An uncle, with her permission, gave petitioner marijuana and other drugs since he was only six years old "as a joke". (Cir. Ct.Tr. at 523–532).

At Tri–County Mental Health Center in 1979, Psychologist Robert Urie, Ph.D. described petitioner, then age ten, as "a severely depressed boy with homicidal and suicidal ideation", "borderline thought disorder" and "emotional neglect." (Exhibit 7). Robert Walker, M.D., a psychiatrist, also reported then that he was at "serious risk" of becoming "homicidal and suicidal". (Exhibit 7).

The state court record included accounts from Butterfield Youth Ranch from 1980–1983, where petitioner was institutionalized from age eleven to fourteen. Those records documented bizarre behavior, depression, hallucinations and the mother's lack of interest. (Exhibit 8). In 1982, psychiatrist James Chappel, M.D., reported that petitioner showed "bizarre behaviors, especially when stressed" and possible schizophrenia. (Exhibit 8). Dr. Chappel feared that with stress, petitioner "would decompensate". (Exhibit 8 at 42, 539–545, 793–794).

In 1983 at Crittenton Psychiatric Center, Michael Harty, Ph.D., a psychologist, and Huseni Poonawala, M.D., the treating psychiatrist, predicted that petitioner would have a "psychotic breakdown" and become "violent or self-destructive". (Exhibit 5). By age 16 and at the time of this homicide, petitioner was living in a public park with other troubled teenagers, taking drugs and drinking excessively. (Cir.Ct.Tr. at 540–542).

---

**10.** The prosecutor also argued that the assistance of counsel may be necessary, and urged to court to require defense counsel to stay available: "We simply believe with the court that there may be some matters where assistance or advice or counsel may be necessary". (Cir.Ct.Tr. at 62).

Immediately before petitioner announced his waiver, psychiatrist Dr. William Logan had testified at the competency hearing that Mr. Wilkins had emotional impairments that caused him to act against his own best interests and "could interfere with his decision making process at certain critical points." (Cir.Ct.Tr. at 22). Dr. Logan had explained that petitioner was very impulsive, had not learned "how to use his mind to make rational common sense decisions", and that "when it comes to making critical decisions, he's very easily frustrated and prone to give out and just take the quick, easy solution primarily based on how he feels and not on what he thinks or what might be the wisest course of action". (Cir.Ct.Tr. at 23–25).

Instead of further exploring the circumstances in light of this background, the trial court's inquiry here consisted almost entirely of leading questions, recited in a manner directed more toward making a record than meaningfully probing whether the waiver was a "voluntary and intelligent choice among the alternative courses of action." *Schone*, 15 F.3d at 788–789. Most of Mr. Wilkins' responses are simply "yes" or "no" answers, as if on cross-examination. (Cir.Ct. Tr. at 75–89).[11] The court's extensive use of leading questions on the record and the lack of any reference to his mental disorders provides no fair support for the conclusion that the waiver was intelligent and voluntary. Mental illness is a factor the trial court must consider when ruling on the validity of a waiver. E.g., *Cooper v. Griffin*, 455 F.2d 1142 (5th Cir.1972).

The Missouri Supreme Court also erroneously equated "competency to proceed" with the requirements for a waiver of the constitutional right to counsel. In the opinion on the mandatory statutory direct review of the conviction and sentence of death under Mo.Rev. Stat. § 565.035, the court states that "any finding of competency necessarily entails the ability to waive certain rights beginning with the very first strains of *Miranda*" and that "juveniles may validly waive the right to counsel". *State v. Wilkins*, 736 S.W.2d 409, 415 (Mo.1987). This legal conclusion sets forth no finding of fact entitled to a presumption of correctness. *Thompson*, —— U.S. at ——, 116 S.Ct. at 459; *Brewer*, 430 U.S. at 404, 97 S.Ct. at 1242; *Cuyler*, 446 U.S. at 342, 100 S.Ct. at 1714–15.

The Missouri Supreme Court did make some factual findings on the statutory direct review which are entitled to a presumption of correctness under § 2254(d). None of those findings, however, require the legal conclusion that Mr. Wilkins' waiver of counsel was knowing, intelligent and voluntary. The court found that the trial judge tried to dissuade petitioner from waiving counsel and had "admonished" petitioner to "talk to those whom he trusted and who could advise him about his chosen course"[12] and stated that the judge had urged petitioner to change his mind. *Wilkins*, 736 S.W.2d at 411–13. This finding, however, relates only to the trial court's recommendation. It does not compel the conclusion that Mr. Wilkins intelligently and voluntarily waived his rights. "The ultimate test for whether there has been a valid waiver of the right to counsel is not the trial court's advice, but rather the defendant's understanding." *Cash*, 47 F.3d at 1088. A detailed admonition by the trial court on the record does not necessarily mean that the defendant acted knowingly, intelligently and voluntarily.

Moreover, the Missouri Supreme Court's appointment of counsel for Mr. Wilkins on the direct review and order for additional briefing and oral argument is consistent only with a finding that Petitioner validly did not

---

**11.** At the arraignment on October 17, 1985, petitioner said only two words ("yes sir") and the hearing was very brief. (Cir.Ct.Tr. at 3–5). At the competency hearing on April 16, 1986, Mr. Wilkins said nothing. Id. at 6–15. Petitioner then stated that he wanted to waive counsel. Although the court questioned him for several minutes, petitioner's responses were very limited. In the Hearing on Waiver of Counsel, on April 23, 1986, the court asked only a series of generic standard leading questions. Petitioner, answered all questions with "yes", "no" or a nod. Id. at 69–96.

**12.** The record also shows that petitioner did not talk to anyone else about the decision to waive counsel. When the trial judge asked petitioner if he had consulted with anyone about that, Mr. Wilkins replied "There's nobody else, nobody else who has a hand in my decision, your honor." (Cir.Ct.Tr. at 75).

intelligently and voluntarily waive his right to counsel. As outlined above, that court had initially appointed amicus counsel to brief issues and appear at arguments. However, when petitioner asked to waive amicus counsel on appeal, the court ordered Dr. Sam Parwatikar to examine him regarding his "competence to waive his right to counsel". (Exhibit 32).[13] After Dr. Parwatikar's evaluation, which included a review of all prior records and an extensive personal interview, he reported back to the court that Mr. Wilkins had mental disorders that "affect his rational reasoning and impair his behavior". Dr. Parwatikar concluded that petitioner was "not competent to waive his constitutional right to counsel." (Exhibit 13 at 16).

After receiving Dr. Parwatikar's report, the Missouri Supreme Court appointed counsel to represent Mr. Wilkins on appeal and ordered supplemental briefs and argument. (Order of Mo.Sup.Ct., Jan. 26, 1987). The court's opinion on direct appeal refers to Mr. Wilkins request to waive counsel, its order for the evaluation from the Department of Mental Health and their subsequent appointment of counsel, but neglects to set forth the findings of Dr. Parwatikar that prompted the court to refuse petitioner's request and to appoint counsel. *Wilkins*, 736 S.W.2d at 411. The court's actions, however, constitute a finding in accord with Dr. Parwatikar's report: that the waiver of counsel was not intelligent and voluntary. See e.g., *Parker v. Dugger*, 498 U.S. 308, 316, 111 S.Ct. 731, 736–37, 112 L.Ed.2d 812 (1991).

On the collateral review under Mo. R.Crim.P. 24.035, the state postconviction court did not make any findings binding on this Court.[14] The postconviction court listed several factual findings that support petitioner's competency to proceed, but that issue is not before this Court. The court's conclusion

that the waiver of counsel was valid was again based on the erroneous legal view that a determination of competency necessarily includes a valid waiver of the right to counsel. R.24.035 Order at 5–9. The only part of the court's order that addresses the waiver of counsel states:

> The court concludes that the finding of competency of movant to proceed entailed the ability to waive certain rights and to make decision necessary for the disposition of the case including the decision to enter plea of guilty and under the circumstances of this case to waive counsel and proceed pro se. The court also concludes a review of all the evidence shows that movant knowingly, voluntarily, and intelligently, and competently waived his right to counsel. The court further concludes that movant suffered no deprivation under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 18(a) of the Missouri Constitution. Court further concludes that no prejudice resulted to movant because of his waiver of counsel. The court concludes that movant is not entitled to relief because of his change of feeling regarding the death penalty. Court concludes movant was mentally competent to proceed as his own counsel.

R.24.035 Order at 9–10. This ruling is a legal determination not compelled by any findings of historical fact, and thus is not entitled to a presumption of correctness. See *Elem*, 64 F.3d at 1200; *Jones*, 938 F.2d at 842.

The state postconviction court made no reference to extensive evidence regarding the background of petitioner, a necessary consideration in determining whether his waiver of counsel was knowing, intelligent and voluntary. *von Moltke*, 332 U.S. at 723–

---

13. Again, the language has caused confusion. Dr. Parwatikar responded in the same terms. However, he explained to this Court that he interpreted the order as asking whether petitioner's waiver of counsel was knowing, intelligent and voluntary. He determined it was not. Dr. Parwatikar testified that petitioner's decision to waive counsel was not a rational choice because his reasoning process was irrational. Dr. Parwatikar further noted that petitioner's mental disorders made him less capable than other sixteen

year old boys in making intelligent and voluntary decisions. (§ 2254 Hrg.Tr. 1–30–96 at 19).

14. The Court will refer to the Findings and Conclusions by the trial court on the motion for postconviction relief under Mo.R.Crim.P. 24.035 as R. 24.035 Order. The transcript from the evidentiary hearing on that motion will be designated R. 24.035 Tr.

24, 68 S.Ct. at 323–24; *Johnson*, 304 U.S. at 464, 58 S.Ct. at 1023. In addition to the mental health professionals who examined and treated petitioner before the crime, other mental health experts examined him and testified in the state court that he was "severely disturbed".

Dr. Logan testified at the state evidentiary hearing that petitioner's lifetime without affection and nurturance had caused a "profound developmental arrest", severe mental disturbances and that he had attempted suicide several times. (Exhibit 14 and Cir.Ct. Tr. at 467–472, 511). Dr. Logan affirmed at this Court's hearing that petitioner was extremely disturbed and immature at age sixteen. His opinion is that petitioner did not voluntarily or intelligently waive his right to counsel and that he was strongly affected by "internal coercion". (§ 2254 Hrg.Tr. at 21–23).

Dr. Dorothy Lewis, a psychiatrist, testified in the state court that Mr. Wilkins had a strong family history of psychotic illnesses, had hallucinations and was paranoid. This was consistent with an earlier diagnosis of "childhood psychosis". (Cir.Ct.Tr. at 24–26, 32–75). Dr. Lewis stated that petitioner's "paranoid orientation ... played a major role in his dismissing his attorney." (Cir.Ct.Tr. at 28).

Dr. William O'Connor, a clinical psychologist, agreed that petitioner was "probably psychotic". (Cir.Ct.Tr. at 139–170). Dr. Jonathan Pincus, a neurologist, confirmed an earlier 1982 diagnosis of schizoaffective disorder. (Cir.Ct.Tr. at 319–327).

It is puzzling and inexplicable why the state court did not make any findings or address whether petitioner's disturbing background of mental serious disorders had any bearing on his waiver of counsel and guilty plea. The state court's only reference to the hearing was the conclusion that "the court further finds the testimony of the doctors relied upon by movant to be unpersuasive and can find no basis for disturbing the court's prior findings of movant's competency." R.24.035 Order at 9.[15]

After a careful examination of the record as a whole, this Court concludes that the finding is not entitled to a presumption of correctness because it does not resolve the factual dispute and is not fairly supported by the record. § 2254(d). The trial court does not explain which doctors it found to be "unpersuasive" or why. The judge does not set out whether he believed that any or all of the doctors were mistaken, lying or whether he just believed their testimony was irrelevant in light of his mistaken view of the law. The court did not make any credibility determination and did not refer to the substance of any expert's testimony.

Even more important, the trial court failed to even mention that Dr. Mandracchia, a witness for the state, testified that petitioner did not voluntarily and intelligently waive his right to counsel or plead guilty. (Exhibit 33 and Cir.Ct.Tr. 891–904). Although the court made findings that Dr. Mandracchia believed petitioner was competent to stand trial, it did not refer to his testimony about the waiver of counsel and guilty plea. (R.24.035 Order at 12–13). The exclusion is conspicuous because the trial court, at the state's request, had expressly ordered Dr. Mandracchia to conduct an additional examination to determine whether petitioner's waiver of counsel, guilty plea and waiver of mitigation were made "knowingly, voluntarily and intelligently". (Exhibit 35).

After examining petitioner as directed, Dr. Mandracchia reported:

1. In the opinion of this examiner, the Movant's waiver of counsel was made knowingly but not voluntarily or intelligently.

2. In the opinion of the examiner, the Movant's plea of guilty and waiver of trial by jury was made knowingly but not voluntarily or intelligently; therefore, the Movant is not viewed as having been competent to make such a decision.

---

**15.** The express wording of the order refers only to competency, but the court made the finding under "Point III" of the order, which purports to address the waiver of counsel. See R. 24.035 Order at 5–10.

·3. In the opinion of the examiner, the Movant's waiver of his right to offer evidence in mitigation of punishment was made knowingly but not voluntarily or intelligently; therefore, the movant is viewed as not having been competent to have made such a decision.

(Exhibit 33 at 5). Dr. Mandracchia further explained the reasons for his opinions at the Rule 24.035 hearing, stating that petitioner's reasoning in making the decision was seriously defective, that he did not consider alternative options and did not reach his decision in a logical fashion. (Cir.Ct.Tr. at 891–904). The Missouri Supreme Court did not address Dr. Mandracchia's report. State court findings are not supported by the record as a whole if the court simply ignores or omits crucial evidence. See e.g., *Walker v. Solem*, 648 F.2d 1188, 1191 (8th Cir.1981).

In this Court's hearing, Dr. Mandracchia credibly and confidently testified to his belief that petitioner's waiver of counsel and guilty plea were not voluntary or intelligent. (§ 2254 Hrg.Tr. on 1–5–96 at 50, 70–77). He explained that he reached his conclusion after consulting with other professionals and considering several factors, psychiatric records, interviews with petitioner, review of all court transcripts and discussions with Mr. Duchardt. (Id. at 74). Dr. Mandracchia testified that it was petitioner's process in making the decision, rather than the decision itself, that was not intelligent and voluntary. Petitioner was obsessed with getting the death penalty and did not explore or consider any other options. (Id. at 51). Dr. Mandracchia explained that although some sixteen year old boys might be able to voluntarily and intelligently waive such rights, petitioner did not. Id. at 73, 76–77. The record indicates that the state courts gave inadequate weight in this case to petitioner's young age at the time of the waiver. Dr. Mandracchia's findings are credible and relevant to the law. See *von Moltke*, 332 U.S. at 723–24, 68 S.Ct. at 323–24; *Young*, 892 F.2d at 1351. The Missouri Supreme Court's did not base its ruling on the appeal of the postconviction motion on any facts which are entitled to deference. As on the statutory proportionality review, the court did make some factual findings entitled to a presumption of correctness, but none that support its conclusion. The Missouri Supreme Court again stated that the trial judge had discouraged petitioner from waiving counsel and that petitioner himself had told the court that he was competent. *Wilkins v. State*, 802 S.W.2d 491, 494–496 (Mo. 1991). The court found that petitioner had a ninth grade education and "average intelligence", and had "demonstrated a credible level of competence in handling his case". *Id.* at 501. The court also noted that "considerable portions of defendant's juvenile records offered by the State were kept out by the sustained objections of the defendant himself." *Id.* at 496.

While there is a presumption of correctness to historical facts such as the court's finding that petitioner had only a ninth grade education and average intelligence, it is hard to appreciate how this shows his waiver was knowing, intelligent and voluntary. The finding regarding his "competence in handling his case" is not fairly supported by the record. Petitioner never really "handled his case". He waived counsel, entered a guilty plea, asked for the death penalty, waived evidence in mitigation, and was sentenced to death. The excluded evidence from the juvenile records mentioned by the court was proof of Petitioner's serious psychiatric history as a child. (Cir.Ct.Tr. at 237).

Other findings are not fairly supported in the record. Contrary to the Missouri Supreme Court's description, *Wilkins*, 802 S.W.2d at 501, the hearing court did not make any credibility determinations or state that Dr. Mandracchia's testimony was "unpersuasive". The motion court only referred to the "doctors relied on" by petitioner. (R.24.035 Order at 9). Dr. Mandracchia was the state's witness.

Even though the trial court made no factual findings, the Missouri Supreme Court assumed the trial judge's conclusion could not be wrong:

In the protracted proceedings hereinbefore discussed, Judge McFarland perhaps more than any person was favorably positioned to understand defendant and evaluate the evidence. He had ample opportunity to

observe the defendant and learn the innermost reason for his decision to waive counsel. This observation and oral examination of the defendant could not be ignored and was necessarily taken into account when assessing the competency of a defendant to waive counsel.

*Wilkins*, 802 S.W.2d at 501. The court's account of the trial judge's "many hours of counseling and conversations" is contradicted by the record and does not resolve the waiver of counsel issue. The trial court asked very few questions that could not be answered with a "yes" or "no". Neither state court considered petitioner's background or the unanimous opinion of all mental health professionals that the waiver was not intelligent and voluntary.[16] Further, the Missouri Supreme Court's resolution of the issue repeatedly refers back to Judge McFarland's determination that petitioner was competent to proceed. However, at the time that the trial court made that decision, petitioner had uttered only two words in the court's presence.[17]

The Missouri Supreme Court's most tenuous statement is that "though defendant did not renounce his waiver of counsel, he manifested his cunning, availing himself of the services of "standby" counsel when it met his purpose." *Id.* at 502. Although the trial court had insisted that Mr. Duchardt remain available as "standby counsel", he did not provide any legal advice or assistance to petitioner. (Cir.Ct.Tr. at 60–69, 81, 161). The designation was artificial. Mr. Duchardt objected in the state court and testified in this Court that he was no more than a reference book that remained on the shelf. (§ 2254 Hrg.Tr. at 87).

The ultimate question of waiver is an issue of federal law. For these reasons, and based on the record as a whole, this Court concludes that petitioner did not knowingly, voluntarily and intelligently waive his right to counsel.

## II. Guilty Plea and Waiver of Mitigation

Analogous to the waiver of counsel claim, Petitioner also asserts that his guilty plea and waiver of mitigation evidence were not knowing, intelligent and voluntary. The State argues that the claim is procedurally barred and that the state court's finding is entitled to a presumption of correctness.

### A. Procedural Bar

▮▮▮ Petitioner fairly presented this claim to the state postconviction court and to the Missouri Supreme Court with factual support and extensive briefs citing to *Westbrook v. Arizona*, 384 U.S. 150, 86 S.Ct. 1320 and *von Moltke*, 332 U.S. 708, 68 S.Ct. 316, as outlined above, and *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (voluntariness of guilty plea), as well as *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (mitigating evidence). There is no procedural bar to this Court's review of the merits. Further, the state courts' conclusion is not entitled to a presumption of correctness under § 2254(d). This is a mixed question of federal law and fact. *Cuyler v. Sullivan*, 446 U.S. at 342, 100 S.Ct. at 1714–15.

### B. Merits

▮▮▮ The United States Supreme Court has repeatedly pronounced that in order to satisfy the dictates of due process, a plea of guilty must be a knowing, intelligent and voluntary act. E.g. *Brady v. United States*, 397 U.S. at 748, 90 S.Ct. at 1468–69. As with a waiver of counsel, the resolution whether the plea was intelligently made de-

---

**16.** This Court has found but one passage in the state court record where the trial court asked petitioner to explain the reasons why he wanted to be executed. (See Cir.Ct.Tr. at 296–97). Petitioner's answer does not indicate an awareness of available defenses that might have resulted in a sentence where he would be eligible for parole at some time. Rather, Mr. Wilkins' response is similar to his statements during interviews with Dr. Parwatikar and Dr. Mandracchia where he gives contradictory and inconsistent explanations for his decision.

**17.** "Q. (by the court): Are you Heath Wilkins?

A. (by petitioner): Yes, sir."

(Cir.Ct.Tr. at 3).

pends on the particular facts and circumstances of each case. See *Johnson*, 304 U.S. at 463, 58 S.Ct. at 1022–23. If petitioner's waiver of counsel was not knowing and intelligent, then the guilty plea entered without counsel also must be invalid. *Arsenault v. Massachusetts*, 393 U.S. 5, 89 S.Ct. 35, 21 L.Ed.2d 5 (1968). However, the court will address this claim independently.

 Under *Boykin v. Alabama*, 395 U.S. at 243–44, 89 S.Ct. at 1712–13, the trial court must undertake a factual inquiry to determine if the plea is voluntary and made with an understanding of the nature of the charge and consequences of the plea. The *Boykin* Court admonished state trial courts that the prerequisites of a valid waiver of constitutional rights must be "spread on the record." A federal court will not presume from an incomplete or silent record that there has been a valid waiver of constitutional rights:

> Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and applicable to the States by reason of the Fourteenth. Second, is the right to trial by jury. Third, is the right to confront one's accusers. We cannot assume a waiver of these three important rights from a silent record.

*Id.* at 243, 89 S.Ct. at 1712 (footnote and citations omitted).

 The test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970). The trial court must establish on the record that the defendant understands all elements of the charges, including the required mental state, and the possible ranges of punishment. *Henderson v. Morgan*, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976); *Nash v. Israel*, 707 F.2d 298 (7th Cir.1983). "[B]ecause a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an under-

standing of the law in relation to the facts." *Boykin*, 395 U.S. at 243, n. 5, 89 S.Ct. at 1712, n. 5.

A guilty plea can be involuntary not only because the defendant doesn't understand the nature of the right he is surrendering, *Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, but also because he has an incomplete understanding of the charge. *Smith v. O'Grady*, 312 U.S. 329, 334, 61 S.Ct. 572, 574, 85 L.Ed. 859 (1941). "Evidence of guilt establishes a factual basis for the plea, not that the defendant understand the law in relation to the facts." *Gregory v. Solem*, 774 F.2d 309, 314 (8th Cir.1985) quoting *Nash*, 707 F.2d at 303, n. 8.

 The record does not show that petitioner knew or understood the specific elements of the charges he faced or all his "alternative courses of action". There was no discussion of the lesser included offenses of second degree murder or manslaughter. The trial court never explained the different degrees of homicide under Missouri law and the differences in punishment.

 Mo.Rev.Stat. § 565.020 (1984) provides that a person commits the crimes of murder in the first degree if he "knowingly causes the death of another person after deliberation on the matter." The only possible punishments are death and life in prison without the possibility of parole. Mo.Rev. Stat. § 565.032. Second degree murder, which carries a parolable sentence, does not include "deliberation". § 565.021; *State v. Jackson*, 511 S.W.2d 771 (Mo.1974). Under Missouri law, deliberation means that the defendant acted after reflection, "in a cool frame of mind." *State v. Shaw*, 569 S.W.2d 375, 377 (Mo.App.1978). If premeditation and malice are shown, but not deliberation, the offense is murder in the second degree. *State v. Ayers*, 470 S.W.2d 534 (Mo.1971).

The record here does not show that Petitioner understood the mental element of the crime charged or the defenses he would relinquish by pleading guilty. The word "deliberation" or its legal equivalent was never used when he entered his guilty plea. (Cir. Ct.Tr. at 104–167). The only words used in relation to mental states were "premeditat-

ed" and "knowingly"—terms that describe the mental state for second degree murder under Missouri law. (Cir.Ct.Tr. at 125). Yet Mr. Wilkins entered a plea of guilty to first degree murder.

▮▮▮▮ Moreover, the trial court expressly told Mr. Wilkins that there were only two potential punishment options: the death penalty and life in prison without parole. (Cir. Ct.Tr. at 77). The record does not establish that petitioner knew, or was ever told, that at a trial, an attorney could present a "diminished responsibility" defense that might result in a conviction on the lesser included offense of second degree murder and receive a parolable sentence.[18]

"The trial judge's constitutional duty to establish on the record the defendant's understanding of a charge with a guilty plea does not depend on whether the charge is complex or simple. However, the trial judge must be even more solicitous in fulfilling this duty when the charge is not readily understandable by a layman." *Nash*, 707 F.2d at 303, n. 6.

Respondent argues that petitioner must have understood about the lesser included option of second degree murder and the diminished responsibility defense because in the hearing on the waiver of counsel Mr. Duchardt told the court that he had "attempted" to tell petitioner his options. This general statement, however, does not satisfy the requirements of *Boykin* or establish that petitioner understood the elements or difference between first degree murder and second degree murder and the different penalties. See *Nash*, 707 F.2d at 303.

Mr. Duchardt never explicitly said what defenses they had discussed. He testified in this Court that he never explained the diminished responsibility defense to him. Mr. Du-

chardt was certain petitioner did not understand all the possible defenses. (§ 2254 Hrg. Tr. at 89–90, 93–94, 97, 105–106).[19] The post-conviction court praised Mr. Duchardt's "talents and ability [and] also his dedication to his clients in the administration of justice." (R.24.035 Order at 11). Having heard Mr. Duchardt's testimony in the federal hearing and reviewed the record in its entirety, this Court concur's with that court's assessment of his professional integrity. This Court finds the testimony of Mr. Duchardt to be clear and convincing that petitioner's waiver of counsel and plea of guilty were made without an adequate understanding of the charges against him and the available defenses.

Although the trial court asked petitioner whether he understood the rights he was waiving, the judge did not ask him to say what he thought these defenses were. The petitioner's own conclusory statement that he was making an intelligent and voluntary plea is directly contradicted by the record. See *Gonzales v. Grammer*, 848 F.2d 894, 900 (8th Cir.1988).

It was particularly important for petitioner to understand the option of a second degree murder conviction because there is much evidence to suggest that, due to his mental disorders, he may not have been capable of deliberation. Although Dr. Logan found that petitioner would be competent to assist an attorney at trial, he testified that petitioner could not deliberate. (Cir.Ct.Tr. at 511–512). Mr. Duchardt, a seasoned defense lawyer, described this case as a very defensible one on this issue of mental state. Indeed, all of petitioner's co-defendants entered pleas of guilty to lesser offenses and received parole-eligible sentences.

---

18. The "diminished responsibility" defense permits a defendant to introduce evidence of a mental disease or defect to prove the absence of a particular mental element of the crime. E.g., *State v. Anderson*, 515 S.W.2d 534, 537 (Mo. 1974); See also Mo.Rev.Stat. § 552.015.2. Unlike the defense of "not guilty by reason of insanity", the defendant accepts criminal responsibility for his conduct, but is convicted of a lesser degree of the crime because the mental defect prevented the defendant from forming the men-

tal element of the higher degree of the crime. *Id.*

19. Mr. Duchardt's testimony was apparently overlooked by the state courts. When asked at the postconviction hearing whether he viewed Mr. Wilkins' decision to dismiss counsel, plead guilty and seek the death penalty as a decision made after "an intelligent weighing of the alternatives", Mr. Duchardt replied: "I never have and I never will." (R. 24.035 Hrg.Tr. at 642).

Further, the trial court's only inquiry into "voluntariness" during the guilty plea was a question whether petitioner had received any promises or threats. (Cir.Ct.Tr. at 104–165). But when petitioner reported that a guard had assaulted him that day, the court dismissed it without delving into the circumstances or effect of the incident:

Court: Now then, this guilty plea petition consists of 6 pages. One of the things in here, even though you've not signed it, it says, question No. 18, "I do not have any complaints against any law enforcement officials concerning my treatment while in jail. I had sufficient food, water, medical care, and bedding and I was not mistreated by any inmate while in jail. There are no exceptions to any of these statements except," and you put yes there ... "I suffered abuse verbally and physically, 10:40, May 9, 1986, before entering the court."

Petitioner: That is correct.

Court: Do you wish to tell the court more about that?

Petitioner: Yes, I do, your honor. I was proceeding to speak out of the holding cells that they have back here (indicates). And I was told to shut my mouth. And I made the statement as I have a right to speak. And I was told to shut my mouth. And then the officer, I'm not absolutely aware of the officer's name but it's the gentleman standing here at the end of the counter (indicates), went back in here to do his business. Well, he came back some time later and picked me up. And I asked him why he told me to shut my mouth. I said, "couldn't you have stated something like be cool or something like that?" And then I told him that he didn't have to come off to me that way. And he pushed me in my face up against the wall and told me that, you know, he can do whatever he wants or something along the lines of, you know, there's nothing I can do about it, he can do what he wants. And when I told him that wasn't so he said, he goes, "You're nothing but a bad assed murderer." And he made a statement, oh, yeah, he said, "What are you going to do about it?" And he was up in my face when this, you know, he did, he pushed me in my face against the wall and made a statement that I was a bad assed

murderer. And then he asked me what I was going to do about it and I didn't say nothing. I just looked at him. And he was right up in my face. And he said, "I thought so," And then he left and we came in here.

Q: All right. Is that the extent of your complaints against your treatment, or about your treatment?

A: Verbally and physically, yeah.

Q: Do you have any other complaints about your treatment while in jail?

A: No.

Q: All right, now, I'll ask you this, as to this treatment that you've complained about, did that have anything to do with your decision to come in here today and waive your right to trial by jury and tell the court that you want to plead guilty?

A: Not that I'm aware of.

Q: Okay. Did you want to sign this petition to enter plea of guilty?

A: Yes, your Honor.

(Cir.Ct.Tr. at 118–120).

The assaulting officer remained in the courtroom throughout the plea and there were no further questions. Although the trial court did not explore this further, Dr. Logan testified that the incident would have intensified petitioner's decision to plead guilty by confirming that the future was hopeless with potential for further abuse. (§ 2254 Hrg.Tr. at 24).

The record does not establish that the guilty plea was intelligent and voluntary, as required by *Boykin*, 395 U.S. at 243, 89 S.Ct. at 1712. The circuit court's record, made with leading questions, does not show that petitioner entered the plea with an understanding of the elements and consequences of all charges and "the alternative courses of action" open to him. See *Alford*, 400 U.S. at 31, 91 S.Ct. at 164. The inquiry did not comply with the court's duty to "investigate as long and as thoroughly as the circumstances of the case demand" in order to protect petitioner from making an involuntary and unintelligent waiver. *von Moltke*, 332 U.S. at 724, 68 S.Ct. at 323–24. The petitioner has established on the record as a

whole that the guilty plea was not valid. The conviction can not stand.

## III. Juvenile Proceedings

Petitioner next claims that the procedures by which he was ordered to be tried as an adult violated due process because he was given inadequate notice of the certification hearing and because the juvenile court refused to order a mental evaluation. The state argues that the claim is procedurally barred and is not an issue for federal habeas review, but merely a challenge to state law procedures for certification of juveniles.

### A. Procedural Bar

▉▉▉ The state relies on the Missouri Supreme Court's holding that the claim was defaulted because petitioner did not challenge the certification in the state circuit court requesting dismissal of the information or seeking remand to the juvenile court. *Wilkins*, 802 S.W.2d at 496–97. A habeas petitioner's failure to comply with a state procedural requirement may bar federal review of the merits if the state bar is "independent and adequate", unless the petitioner shows "cause and prejudice" for the default or a fundamental miscarriage of justice. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). A state procedural rule is not adequate to bar federal relief if the petitioner was acting pro se at the time of the default and did not make a knowing and intelligent waiver of rights. See e.g., *Cooper v. Griffin*, 455 F.2d 1142 (5th Cir.1972). The Missouri rule barring a challenge to the certification procedures when a guilty plea is entered in circuit court does not apply if the guilty plea was not valid. See *State v. Simpson*, 836 S.W.2d 75 (Mo.App.1992). Whether a state procedural rule is adequate to bar federal review is an issue of federal law, to be decided by the federal Court. *Williams v. Lockhart*, 873 F.2d 1129, 1131–32 (8th Cir.1989). This Court will address the merits of the claim.

### B. Merits

Petitioner's hearing in the juvenile court to determine whether he would stand trial as an adult was five days after his arrest. Counsel received notice of the specific charge and factual allegations less than forty eight hours before the hearing. Thus, petitioner argues that counsel had insufficient time to prepare. Although counsel was able to obtain some records from petitioner's juvenile file, he had little time for review or investigation. There were a number of psychiatric records in the file, which indicated a history of serious mental disturbances since age nine. Counsel learned later, however, that other important records were missing.[20] In light of this history, counsel requested the juvenile court to order a mental evaluation of petitioner before deciding whether to waive the juvenile court's jurisdiction, but the court refused. Petitioner contends that the lack of adequate notice and denial of the mental evaluation deprived him of a meaningful adversarial hearing.

▉▉▉ "It is clear beyond dispute that the waiver of [juvenile court] jurisdiction [to permit criminal prosecution as an adult] is a 'critically important' action determining vitally important statutory rights of the juvenile." *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). Consistent with the serious nature of the proceeding, the Supreme Court has held that such hearings "must measure up to the essentials of due process and fair treatment". *Id.* at 560–63, 86 S.Ct. at 1056–58; see also *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The *Gault* Court ruled that under the due process clause, fundamental fairness requires that juveniles receive the benefits of essential constitutional provisions, including the right to counsel and proper notice. The mere appointment of counsel for the proceeding does not necessarily satisfy due process. The duty to assign counsel "is not discharged by an assignment at such time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case." *Powell v. Alabama*, 287 U.S. 45,

---

20. Mr. Duchardt testified before this court that he had no time to prepare before the juvenile certification hearing and that the records he had been given were incomplete. (§ 2254 Hrg.Tr. at 79–80).

53 S.Ct. 55, 77 L.Ed. 158 (1932). The notice to counsel must be adequate to permit sufficient preparation as the particular case demands. See *Geboy v. Gray*, 471 F.2d 575 (7th Cir.1973).

The Supreme Court has also held that there is a due process right to the assistance of a psychiatric expert if a defendant's mental condition is a significant factor in the case. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Dr. Logan has testified that if he had been able to evaluate petitioner before the proceeding, he would have advised the juvenile court that petitioner needed a specific type of intensive psychiatric therapy and hospitalization. The treatment could have been provided through the court. Dr. Logan would have refuted the testimony of witnesses from the Division of Youth Services who obviously did not understand the scope and nature of petitioner's problems. (Cir.Ct.Tr. at 464–467).

The adequacy of notice and need for the mental evaluation are issues which implicate due process concerns. The portions of the juvenile file that were available revealed a significant history of mental problems which suggests the need for further evaluation. Given the seriousness of the charges and petitioner's history of mental illness, the notice to counsel does not seem sufficient to give petitioner the benefit of the adversarial process. See *Lankford v. Idaho*, 500 U.S. 110, 127–28, 111 S.Ct. 1723, 1733, 114 L.Ed.2d 173 (1991).

However, in order for petitioner to prevail on this due process claim, he must prove that, under the totality of circumstances, the errors were so prejudicial they rendered the entire proceeding fundamentally unfair. See e.g., *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Petitioner has made no showing that the outcome of the juvenile proceeding would have been any different if counsel had been given additional time to prepare or if a mental evaluation had been ordered. There is no indication that the juvenile court would not have still waived its jurisdiction. Without such proof of prejudice, the claim must be denied.

### IV. Conflict of Interest—Prosecutorial Misconduct

Petitioner next asserts that his right to due process of law was violated because the prosecutor, Larry Harman, had previously represented him in a juvenile case, failed to disclose that prior representation to counsel or the court and used confidential information in prosecuting the case. The state argues that the issue is procedurally defaulted and without merit.

#### A. Procedural Bar

The Missouri Supreme Court denied this claim on the basis of a procedural bar, stating that the issue was not timely presented in petitioner's first motion for postconviction relief. *Wilkins*, 802 S.W.2d at 504. Petitioner did raise the issue in a second amended motion filed outside of the time limits in Rule 24.035, but the court refused to consider the merits, holding that the limitation period was mandatory and could not be extended. *Id.* citing *White v. State*, 779 S.W.2d 571, 572 (Mo.1989).

A federal habeas court may consider the merits of a petitioner's procedurally defaulted claims if the petitioner establishes both cause for and prejudice from his default. *Wainwright v. Sykes*, 433 U.S. at 87, 97 S.Ct. at 2506–07; *Engle v. Isaac*, 456 U.S. 107, 126–30, 102 S.Ct. 1558, 1571–73, 71 L.Ed.2d 783 (1982). To establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). Proof that the factual basis for the claim was not reasonably available to counsel or that the interference by state officials made compliance impracticable are examples of such factors. *Amadeo v. Zant*, 486 U.S. 214, 222, 108 S.Ct. 1771, 1776–77, 100 L.Ed.2d 249 (1988); *Parkus v. Delo*, 33 F.3d 933, 938 (8th Cir.1994); *Bliss v. Lockhart*, 891 F.2d 1335, 1341 (8th Cir.1990).

Petitioner has established cause for his default because the factual basis for this claim was not available to counsel at the time that the first amended postconviction motion

was filed on August 30, 1988. Counsel learned for the first time on April 19, 1989 that Mr. Harman had represented petitioner in juvenile court proceedings. On that date, postconviction counsel found an order from the Juvenile Court, dated 1979, committing petitioner to the Department of Mental Health for psychiatric treatment, which listed Mr. Harman as his attorney. Apparently there is no other record of Mr. Harman's representation because the Juvenile Court file and the Clay County Public Defender file had both been destroyed.

Mr. Harman did not disclose this conflict of interest to the court or to counsel, and counsel could not otherwise reasonably have known of the prosecutor's prior relationship with petitioner. The record shows that in August, 1985, Mr. Duchardt had asked the Western Missouri Mental Health Center for copies of all records on petitioner, but was told by a clerk on August 21, 1985 that none were available. Postconviction counsel began requesting files from the Mental Health Center shortly after being appointed in 1988, but no records were found until April 19, 1989, when a records supervisor searched in the basement files.

When postconviction counsel learned of Mr. Harman's prior involvement with petitioner, he immediately filed the second amended Rule 24.035 motion alleging that Mr. Harman's prosecution of his former client was a conflict of interest that violated due process. After the Missouri Supreme Court refused to consider the merits of the claim on the Rule 24.035 appeal, the issue was presented to that court in a Petition for Writ of Habeas Corpus filed under Missouri Supreme Court Rule 91, with supporting proof. Under these circumstances, factors external to the defense prevented the discovery of the only existing document showing Mr. Harman's prior representation. See *Amadeo,* 486 U.S. at 222, 108 S.Ct. at 1776–77; *Parkus,* 33 F.3d at 938. Petitioner did all he could to exhaust the claim in the state court. Principals of comity and federalism are not offended. There is cause to overcome the procedural bar.

**B. Merits**

As a public defender in 1979, Mr. Harman represented petitioner, then age ten, on a burglary charge in the juvenile court. Petitioner's mental condition was a key issue in those proceedings. A number of confidential psychiatric reports were made which included sensitive personal data about petitioner and information about his attempt to poison his mother a year earlier. The records included opinions by mental health professionals that petitioner was severely depressed and had suicidal and homicidal impulses. The outcome of the 1979 matter was that Mr. Harman stipulated to petitioner's commitment to the Division of Mental Health.

Six years later, as the lead prosecutor on this case, Mr. Harman actively sought a conviction and the death penalty for his former client. There is no question that the prosecutor remembered the earlier representation. On August 14, 1985, the day before the juvenile certification hearing, Mr. Harman requested an advisory opinion on the matter from the Missouri Bar Advisory Committee.[21] The Committee's response, dated August 29, 1985, stated:

> It is the opinion of the Advisory Committee that there would be no conflict of interest for you to prosecute a criminal case against an individual whom you represented in an *unrelated* juvenile court matter in 1979. This *assumes that no information was obtained at the time of the earlier representation which would be used against the defendant in the course of this prosecution.*

(Exhibit 23) (emphasis added). The state contends that this answer constitutes a finding that there was no conflict of interest and that the prosecutor violated no ethical rule. This Court is not convinced. The Committee's response is generic and does not refer to any specific circumstances in this case. Under the facts in the record as a whole, the assumption that the matters were "unrelated" or that information obtained in the earlier representation would not be used in the

---

**21.** The exact content of Mr. Harman's letter to the Advisory Committee is not clear. The state has not provided a copy of the document to this Court.

prosecution of Mr. Wilkins is refuted. It is presumed that an attorney receives confidential information in the course of representing a client. *United States v. Shepard*, 675 F.2d 977 (8th Cir.1982).

The Missouri disciplinary rules, also adopted in this federal district, restrict an attorney's employment adverse to a former client.[22] Rule 1.9 is derived from counsel's duty to preserve the confidences of his client in order to preserve the integrity of the adversary system. As a prosecutor, however, Mr. Harman also had additional ethical obligations. "The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803, 107 S.Ct. 2124, 2135, 95 L.Ed.2d 740 (1987) quoting Ethical Consideration (EC) 7–13 of Canon 7 of the American Bar Association Model Code of Professional Responsibility (1982). See also *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) and EC 5–15 (if there is a possible conflict of interest, lawyer "should resolve all doubts against the propriety of the representation"); EC 906 (lawyer has duty to avoid "not only professional impropriety but also the appearance of impropriety").

Concerns for potential misconduct in this setting are not merely speculative. In *Young*, 481 U.S. at 807, 107 S.Ct. at 2137–38, the Supreme Court noted that "an arrangement represents an actual conflict of interest if its potential for misconduct is deemed intolerable. The determination whether there is an actual conflict of interest is therefore distinct from the determination whether that conflict results in any actual misconduct."

The question for this Court, however, is not whether the prosecutor's actions violated the ethical code. Habeas corpus relief is available only where there are errors of constitutional magnitude. *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Newlon v. Armontrout*, 885 F.2d 1328, 1336 (8th Cir.1989). Petitioner asserts that the prosecutor's failure to disclose his prior representation to the trial court or to counsel violated the due process protections of the United States Constitution.

It is well-settled that a fair trial in a fair tribunal is a basic requirement of due process. *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927). There is a constitutional violation of due process when an attorney represents a client and then participates in the prosecution of that client in the same matter or another matter with a substantial relationship to the first. See *United States v. Schell*, 775 F.2d 559, 566 (4th Cir.1985); *United States v. Wilson*, 497 F.2d 602 (8th Cir.1974); *Smith v. Whatcott*, 757 F.2d 1098 (10th Cir.1985). "The right to due process and a fair trial include the essential element that there is no unfair advantage to the prosecution by reason of a prior professional relationship between [the prosecutor] and a criminal defendant concerning the same or closely related matter." See *State v. Boyd*, 560 S.W.2d 296 (Mo.App.1977).

The threshold question then is whether the prosecution for the murder of Nancy Allen had a substantial relationship to the juvenile court matter in 1979. The applicable test is that described in *Arkansas v. Dean Foods Products Co.*, 605 F.2d 380 (8th Cir.1979) overruled on other grounds in *In re Multi–Piece Rim Products Liability Litigation*, 612 F.2d 377, 378 (1980):

> The former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action (where) the attorney previously represented him, the former client. The Court will assume that during the

---

**22.** Rule 1.9 provides:
Conflict of Interest: Former Client
A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation.

*Dean Foods,* 605 F.2d at 383.

Under the law of this Circuit, "the attorney-client relationship raises an irrefutable presumption that confidences were disclosed." *Id.* at 384. If there was a substantial relationship between the two matters, and if the prosecutor will be called on to use against his former client any confidential knowledge gained through their former association, then there is prejudice to the accused. *Gajewski v. United States,* 321 F.2d 261, 267 (8th Cir.1963). Whether there is a "substantial relationship" involves a full consideration of the facts and circumstances in each case. See *Dean Foods,* 605 F.2d at 384.

■■■ Virtually every issue in this case involves questions of petitioner's mental disturbances. As outlined above, the juvenile certification, waiver of counsel, guilty plea and waiver of mitigation all involved concerns related to petitioner's mental condition. Mr. Harman had confidential knowledge of petitioner's psychological background through his former representation which resulted in commitment to a mental institution. The Court finds that information was substantially related to the later prosecution. Mr. Harman had the discretion to seek or waive the death penalty, and that decision necessarily involved subjective assessments of petitioner's state of mind and mental health. In a matter of such grave importance, the prosecutor had a duty to disclose his prior representation so that appropriate actions could be taken to preserve the integrity of the proceedings.

This Court has found only one case where a prosecutor has sought the death penalty in a case against a former client that he had personally represented. *State v. Stenger,* 111 Wash.2d 516, 760 P.2d 357 (1988), held that when the death penalty is sought, knowledge about the defendant's background disclosed in the earlier representation becomes "closely interwoven" with the capital case:

This is because the death penalty is the ultimate punishment and, before the prosecuting attorney may ask imposition of the death penalty, the prosecuting attorney must have reason to believe that there are not sufficient mitigating circumstances to merit leniency.... In short, privileged information obtained by the prosecuting attorney when he was the defendant's counsel in the previous case could well work to the accused's disadvantage in this case where the death penalty was sought.

*Id.,* 760 P.2d at 360. The *Stenger* court disqualified the prosecutor. This Court agrees with the reasoning of *Stenger.* Here, as in *Stenger,* the capital murder case prosecuted by the defendant's former lawyer was substantially related to the earlier case.

Mr. Harman also erred by seeking the death penalty, at least in part, on the basis of his own personal opinion that petitioner had no serious mental disturbance. At the sentencing proceeding, Mr. Harman asserted:

The state has attempted to be fair also, your honor, in the sense that we also listed what could be considered as mitigating circumstances, just the evidence touching on those.

Whether or not the defendant was under a severe or substantial emotional disturbance at the time of the crime. *We don't believe that that actually existed,* but we did go into that with Dr. Logan.

Another one, perhaps, was that we substantially, had substantially impaired capacity to appreciate the criminality of his conduct or the ability to conform his conduct to the requirements of the law.

And *we don't think that is a mitigating circumstance that is present in this case.* But, we elicited the testimony so the court would have the benefit of both sides.

(Cir.Ct.Tr. at 293) (emphasis added).

■■■ A prosecutor's misconduct violates due process if the defendant was prejudiced by the prosecutor's actions to the extent that the proceeding was fundamentally unfair. *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). *Dodd v. Nix,* 48 F.3d 1071, 1075 (8th Cir.1995). The prosecutor's personal belief is not the proper basis for a sentence of death. See *Newlon,*

885 F.2d at 1336. This Court recognizes that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor". *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). However, fairness was compromised here.

Petitioner was prejudiced by Harman's failure to disclose his personal knowledge of petitioner's prior commitment to the department of mental health and the facts and circumstances underlying that disposition. This was relevant to the court's duty to preserve the adversarial process and in accepting the guilty plea.

The prosecutor's conflict of interest presents a very serious issue. It seems incredulous to imagine a former defense attorney, privy at one time to the thoughts of a juvenile defendant so disturbed that he is committed to a mental institution, to then turn prosecutor and accuser seeking the death penalty for his former client without disclosing the relationship to the court and to counsel. This is particularly disturbing in this case because petitioner waived counsel, entered a guilty plea to a capital charge, waived mitigation and was sentenced to death. The presence of a former defense attorney and confidant at the opposing table would certainly inhibit a defendant from trusting his present counsel or taking counsel's assertions of confidentiality very seriously.

"A prosecutor acts in a quasi-judicial capacity, and he and those associated with him should represent public justice and stand indifferent as between the accused and any private interest. . . . An attorney cannot be permitted to assist in the prosecution of a case if, by reason of a professional relationship with the accused, he has acquired a knowledge of facts ... which are closely interwoven with [the issues in the case]." *People v. Polonowski,* 258 Ill.App.3d 497, 196 Ill.Dec. 318, 321, 629 N.E.2d 1162, 1165 (1994) quoting *State v. Curry,* 1 Ill.App.3d 87, 272 N.E.2d 669, 672 (1971).

This is a structural defect which defies analysis by "harmless error standards". See *Young,* 481 U.S. at 809, 107 S.Ct. at 2138–39. Beyond a reasonable doubt, the entire con-

duct of the criminal proceeding was obviously affected by the conflict of interest caused by the prosecutor's prior representation and his nondisclosure. See *Arizona v. Fulminante,* 499 U.S. 279, 309, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). On this habeas review, the Court has cautiously considered whether the error had a substantial and injurious effect on the outcome of the case: petitioner's conviction and sentence of death. See *Brecht v. Abrahamson,* 507 U.S. 619, 623–25, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993). Having considered all facts and circumstances, including petitioner's juvenile history, background of abuse, mental disorders and institutionalization, the prosecutor's access to confidential information and failure to disclose the prior representation, petitioner's refusal of counsel and guilty plea, the Court finds that the error had a substantial and injurious effect on the outcome. See *O'Neal v. McAninch,* — U.S. ——, ——, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995). The writ of habeas corpus will issue on this claim also.

## V. Proportionality Review

Petitioner next alleges that the proportionality review conducted by the Missouri Supreme Court was constitutionally flawed in violation of the Eighth Amendment and the Due Process clause of the Fourteenth Amendment. The state responds that the claim does not present any federal constitutional concern.

█ It is clear that the Eighth Amendment does not require a state appellate court to determine whether a death sentence is proportional to that imposed in other cases. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, the holding of *Pulley* does not altogether settle the issues raised here. Although not mandated by the Constitution, Section 565.035 of the Missouri Revised Statutes (1986) does require that every death sentence must be reviewed by the Missouri Supreme Court to determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the

strength of the evidence and the defendant." In *Pulley,* neither the state constitution nor any statute mandated this type of review.

 This Court is mindful that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions". *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). However, the concern here is more than a matter of state law. In *Hicks v. Oklahoma,* 447 U.S. 343, 346, 100 S.Ct. 2227, 2229–30, 65 L.Ed.2d 175 (1980), the Supreme Court held that a state creates a liberty interest when it provides a criminal defendant with a "substantial and legitimate expectation" of certain procedural protections. "[A]n arbitrary deprivation of such entitlement may create an independent federal constitutional violation". *Toney v. Gammon,* 79 F.3d 693, 699 (8th Cir.1996) quoting *Hicks,* 447 U.S. at 346, 100 S.Ct. at 2229. The whole purpose of the Due Process Clause is to prevent arbitrary deprivations of liberty or property. *Honda Motor Co. v. Oberg,* 512 U.S. 415, ——, 114 S.Ct. 2331, 2342, 129 L.Ed.2d 336 (1994).

This Court is not concerned with the general procedures established for the Missouri Supreme Court's statutory review of death sentences. In that regard, the Eight Circuit has determined that there is "no unfairness or deprivation of due process". *Murray v. Delo,* 34 F.3d at 1377. The question here, rather, is whether petitioner sustained an arbitrary deprivation of a liberty interest in this particular case.

 The Court finds that Mr. Wilkins had a substantial and legitimate expectation that the Missouri Supreme Court's proportionality review would be a thorough and meaningful one, with full consideration of "whether the sentence of death [was] excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of evidence and the defendant." § 565.035. However, the record shows that the court did not consider certain facts necessary for an adequate review in this case.

The Missouri Supreme Court focused only on the aggravating circumstances of the crime and the strength of the evidence of guilt. The court did not appraise the relevance of petitioner's young age in the review. There is no mention that Mr. Wilkins had been committed to the Department of Mental Health at age ten, had been institutionalized for more than three years and that psychiatric and treatment records documented severe emotional disturbances. This evidence directly supported at least two statutory mitigating circumstances that commanded careful and full consideration. See Mo.Rev.Stat. § 565.050. Further, the court gave no regard to the sentences of the other persons involved in the homicide.[23]

Three justices dissented for these reasons, with Justice Donnelly writing to detail the factual omissions and law contrary to the court's conclusion:

> First, we consider age. In four capital cases involving youths of comparable age, a life sentence was imposed. *State v. Greathouse,* 627 S.W.2d 592 (Mo.1982) (defendant age seventeen); *State v. Allen,* 710 S.W.2d 912 (Mo.App.1986) (defendant age sixteen); *State v. White,* 694 S.W.2d 802 (Mo.App.1985) (defendant age seventeen); *State v. Scott,* 651 S.W.2d 199 (Mo.App. 1983) (defendant age sixteen). Only one Missouri youth has been sentenced to die who was seventeen years or younger as of his crime. *State v. Lashley,* 667 S.W.2d 712 (Mo. banc) cert. denied, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984).

*Wilkins,* 736 S.W.2d at 421 (Donnelly, J., dissenting). Justice Donnelly reviewed petitioner's history of mental and emotional disturbances, institutionalization, suicide attempts and history of drug use, citing from the reports of the mental health professionals. He concluded:

> On these facts, considering defendant's age, and his significant cognitive-emotional

**23.** Marge Filipiak received a suspended sentence and probation. Ray Thompson was sentenced to 15 years on a reduced charge of second degree murder. Patrick Stevens was sentenced to life imprisonment on the reduced charge of second murder and will be eligible for parole after he has served 15 years. The importance of this consideration has been stressed. See *State v. Schneider,* 736 S.W.2d 392, 405–06 (Mo.1987) (J. Blackmar, dissenting).

disorder, and connected extensive drug abuse, we hold the sentence excessive and disproportionate.

*Id.* at 422. This Court agrees with the assessment of Justice Donnelly, which is supported in the record by clear and convincing evidence.

■ Although the United States Supreme Court does not require a state to do a proportionality comparison in every case, it is well established that the state court must provide a meaningful appellate review as an essential factor in protecting the arbitrary and capricious imposition of the death penalty. *Parker v. Dugger*, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). The review by the Missouri Supreme Court, however, was not meaningful and resulted in an arbitrary deprivation that violated "petitioner's right to liberty is a denial of due process of law." *Hicks*, 447 U.S. at 346, 100 S.Ct. at 2229; *Parker*, 498 U.S. at 322, 111 S.Ct. at 740. See also *Vitek v. Jones*, 445 U.S. 480, 488–89, 100 S.Ct. 1254, 1261–62, 63 L.Ed.2d 552 (1980); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

This conclusion does not create a new rule of law under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The rule of *Hicks*, holding that a state statute regarding criminal procedure may create a liberty interest triggering due process, was issued in 1980. Petitioner's conviction was not final until 1989. *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). See *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). There is no retroactivity bar under *Teague.*

### VI. Aggravating Circumstance

■ Petitioner's last remaining claim is that his death sentence is cruel and unusual in violation of the Eighth Amendment because the aggravating circumstance "depravity of mind" is unconstitutionally vague. The state does not assert a procedural bar, but defends the issue on the merits.

The trial court sentenced petitioner to death after finding that two aggravating cir-

cumstances existed: first, that "the murder in the first degree was committed while the defendant was engaged in the perpetration of the felony of robbery" and second, that "the murder in the first degree involved depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible, or inhuman." (Cir.Ct.Tr. at 300–01).

Petitioner contends that the words "depravity of mind" are unconstitutionally vague in this case because the trial court did not specifically find "torture" and did not explain the basis of this finding. In support, petitioner relies on *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and *Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir. 1989), cert. denied, 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990).

The difference between this case and *Godfrey, Maynard* and *Newlon*, however, is that Mr. Wilkins was sentenced by the judge, not a jury. In *Walton v. Arizona*, 497 U.S. 639, 653, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990), the Supreme Court held that "trial judges are presumed to know the law and to apply it in making their decisions". This claim is denied.

### Conclusion

For the reasons stated above, the Court holds that the petition for writ of habeas corpus will be conditionally granted. This conditional writ shall become unconditional and permanent unless the State of Missouri allows petitioner to withdraw his plea of guilty and commences proceedings to afford petitioner a trial within sixty days of the date of this Order.